Good morning. Mark Eisenhout on behalf of NWHW Holdings, Inc. May it please the Court, I would like to reserve three minutes for rebuttal, if I may. This is a case, a DNO insurance policy coverage for defense fees was denied. Summary judgment was granted for the insurer, denied for the insured. This cross motions for summary judgment. There were two issues that I wanted to address briefly before getting into the heart of the appellate matters. And that is, these two issues were not addressed by the lower court. They were not addressed in our opening brief. They were raised in the insurance carrier's brief, but we did not put them in the reply brief. So I wanted to briefly touch on them to make open or reply. They were in the answering brief, but we didn't. But you didn't address those in the reply brief. We failed to, we should have. Why haven't you waived? They're addressed thoroughly in the underlying case. I don't think that gets you to first base in the Court of Appeals. Well, it's in the record. Our arguments are in the record. We did not put them specifically. Our rules say that you've got to clearly and distinctly raise the argument, either in the opening brief or the reply brief. And if you didn't, you've waived. So we've waived all of our arguments as to the response to the underlying court's ruling. In the answering brief, there were, at the very tail end of the answering brief in the last couple of pages, there were two issues raised that we did not address in our reply brief, which we should have done and failed to do. So that's what I wanted to address briefly now before we get into the heart of the matter that was addressed in the... But you don't get to do that in an oral argument. I guess that's, I mean, you're welcome to say anything... You can't make that argument. You're welcome to say anything you want, but... Tell us why the district court didn't hear it. Yeah, so... Get right into it. So in this case, what the district court did do was it ruled on the government funding exclusion. So it's undisputed in this case that the main policy covers what the government's investigation into a false claims act set of allegations against franchisees and the franchise or New Horizons that I represent. And that... So the only question was, was there an exclusion that would then take that coverage away? And here, there was no exclusion that would take that coverage away. The government funding exclusion appears at page 534 in the process is, of course, what the insured New Horizons suffered, does not include the return of funds which were received from any government agency. And so the issue here is, was there a return of funds that were received from a government agency at issue that would preclude coverage or at least trigger this provision because there's some coverage? How is that different from co-participants in a scheme to defraud who divide up the proceeds? As I understand it, your client got a cut through royalties of the funds that the government paid to the franchisees for student tuition. So let me answer it with two prongs if I could. The first prong is there's a significant portion of the money that the government complained of that never went to either the franchisees or to my client, New Horizons. And that is in the record at page... But that goes to the amount of damages. It doesn't go to whether or not the claims were fraudulent. So if any part of the claim was fraudulent, that's a violation of the False Claims Act. Correct. But the False Claims Act is covered. So there's an insurance policy that covers our defense fees. I thought your argument was my client never received any of the proceeds of the fraud. I'm having a hard time squaring that with the facts here where your client received a royalty on basically all of the claims that were submitted to the government. Again, the coverage... We have to make sure we're clear between whether or not the False Claims Act claims could have been viable. The government shows that they weren't because they didn't pursue them. But there was a significant investigation in which my client incurred almost $1.5 million in attorney's fees. What happened to the government here? They just sort of disappeared like a thief in the night. They asked for tolling agreements a couple of times. And at some point, our client said, we don't think you have anything and we're not... They want $500 million from you and you said, no, we're not paying. And then they just went away. Correct. And frankly... Taxpayer, I want to know what happened. I'd say you got a lot of benefit out of your $1.5 million in legal fees. I would agree with that. But I don't think the question... Don't agree too much. I mean, I don't know if there's a statute of limitations, but... If there was a question about liability, then what you're asking, Judge Tallman, would be certainly right dead center relevant. But this is a question about whether or not the insurance policy, the New Horizons purchase that we all agree says it's covered, unless it's government funding somehow... Provision somehow takes that coverage away. I thought that... So wait. Just so I have this clear in my mind. If it's the government funding preclusion or the government funding coverage endorsement, then it's the $1 million retention cap? Correct. Which we did not hit if you... If you accept it. So I'm just trying to figure out how we're trying to decide this case, because your argument is it didn't even fall within that, so there was no $1 million cap. Correct. So we have two main issues here, right? We have the timing of when did a claim occur. But that only kicks in if we say that the funding endorsement applies. Well, it kicks in for both for different reasons, because if a claim occurred earlier than the underlying court found, then we would have exceeded the $1 million by some extent. Obviously, not nearly as much as if the government funding exclusion goes away. But is the $1 million cap no matter what for your client? No. Only if the government funding exclusion applies. And so what we're saying is the government funding exclusion... Again, this is language written by the insurance carrier. They're bound by their language. The law is clear that you interpret these narrowly in favor of the insured and against the insurer. And in this language, the only thing that's excluded is if my client suffered loss, that is a return of funds which were received from any governmental agency. And that's at page 534. That's from the insurance policy in the record at page 534. So your argument is essentially a money laundering argument that the funds were washed by the franchisees before they paid royalties to the franchisor out of the proceeds of the fraud? No, Your Honor. Our argument is the investigation and the defense cost we incurred is covered by the policy unless the insurer can prove, they have the burden here to establish that this exclusion applies. And it does not apply. The government, what they're saying is the government came to New Horizons, my we want you to return those funds. And that's not... And they're willing to settle for $39 million even though you potentially faced exposure of $500 million. Well, they made an offer of $39 million. We made an offer of $0 million and they so far have accepted that. So the point, though, is there is insurance coverage unless the carrier can prove that what the government did was came to us and said, hey, you've got our money. Give it back. Return those funds to us. And that's clearly not what happened here. And we can... That's a portion of what happened. Yeah. A very minute, small portion. $39 million. But it doesn't matter because unless it's all... So unless all of it falls through... I see. So your argument is there's still some portion that's not just a return and we should be covered for it. I would... Yes. And I haven't done the calculation, but 99.9% is covered. The defense costs are covered. And let me tell you why, if I could, because I think I can make the point fairly quickly without running out of time here. And that is, in the record at page 751, it's one of the pages, the damages pages, the government presented a 185-page slide deck. And they said, here's our presentation against you, New Horizons, why you, the franchisor, are on the hook. And obviously a very detailed presentation. At page 751, there was one of their... It's called total single damages presentations. And in that they said, the first line of damages that you're liable for is the total pay that we paid because of you to your franchisees. And that's $224 million. Now, the second line is even easier to see, though, that this is not the government coming to us saying, hey, give us our money back. It was total, B-A-H, that means basic allowance for housing, paid to veterans. That's what this slide deck says. You caused us, the government, to give $90 million, that's 89.7 million, to veterans because of your fraudulent claims that you submitted through your franchisees. But why doesn't that fall within the return of funds that it fraudulently received from the government? Because the government is coming to us and saying, it's damages that they're seeking from us, not a return of funds. The government coming to us saying, you caused us to pay $90 million to veterans for a housing allowance. We're not going to the veterans and asking for that money back. And we can't come to you and ask for it back because you don't have it. We're coming to you and saying, you caused us to suffer damages. It's a consequential damages argument. It's a damages argument. It's as if, you know, I said something to you, Your Honor, and caused you to give money to somebody else. So from your standpoint, why is that even relevant? If my analysis is correct, that they actually got a portion of the proceeds of the claims that were directly paid by the government to the franchisees, isn't that demanding a return of funds that came from the government? No. So let me sketch out for you exactly what happened as far as how they presented their claims. Because that's important, what the government claims, right? They said, we paid $224 million to your franchisees for education for veterans. Okay? At best, some small percentage of that flowed to us. It wasn't 6%, and I'll tell you why. Because franchisees pay the higher of two amounts each month. They either pay a flat minimum monthly fee, or if they happen to have enough sales that month, and if the government happens to have been one of the payors that month, they pay 6% if it exceeds enough money. So in certain months, we would have gotten 6% of what the government paid. In other months, we would have gotten 0%. But why isn't that enough to trigger the government funds? I don't agree, but I would say that at best, that's the best argument that the carrier has here, is that for some small piece of the pie, we would not cover that loss. We would not indemnify you for that loss. But it would still trigger the obligation to pay defense costs. Correct, because 90-plus percent of all of this money never came to New Horizons. It's not a request to New Horizons to return funds. It's a demand to New Horizons to pay damages. That's why that's very important, because this is only about defense costs that were incurred. It's not about indemnity, because there was never a claim made. That's why I'm having a hard time understanding what difference does it make if they spent $89.7 million on housing for veterans. It makes a difference because they're not coming to you, Your Honor, now asking for money back. They're coming to you saying, you caused me to make payments over here. I'm not going to them and getting the money back. I'm just telling you to pay for it because it's your fault. Wasn't the government's $39 million settlement demand sort of an amalgamation of all of the monies that they had expended for this program? No. They had expended, they said, $223 million plus $90 million. I guess I'm trying to understand, how did they get down to $39 million? Because that was the demand. Well, if you want to focus on the demand for a minute, the demand tells us they were asking for more than a return of funds from New Horizons, because in that page 71 in the record, their slide deck, they said that what we received, they calculated what we received, was $13.4 million. That was an overestimate because of what I just told you about how the – Why isn't that enough to trigger coverage? It – coverage was triggered. They're trying to untrigger coverage.  I know. I understand. But it doesn't untrigger coverage. You should be asking your – It doesn't untrigger coverage 100%. Clearly, coverage was triggered is our position. Yeah. And you have to take – Does it fall within the $1 million limit or not? The government funding exclusion, if it applies, and it only applies if it meets the specific language that the insurance carrier chose to put in the language, only if it applies does this $1 million self-retention apply. So if the self-retention does not apply, they were required to start paying from day one. And then the question we have is, when is day one? And day one gets to the timing of the claim. And I can tell you quickly, because I know we've spent some time on this, but the timing of the claim, you have a CID that comes out in September of 2019. We all agree that that – The problem, just to cut to the chase, the agreement says it only – it's triggered when there's a written demand for monetary or non-monetary relief. Yeah. So what happened in December of 2019? We get a – from the AUSA, the prosecutor in charge of this whole thing, to our general counsel a email that attaches two very ominous things. It attaches a settlement with the franchisee. I believe it's ominous. How is it a demand for monetary or non-monetary? No one wants to receive a CID from the government. We give you that. We're skipping past the CID. You don't only have a CID. Then they've settled, but how is it a monetary or non-monetary relief? Because they've had a very unique and more than ominous a demand in that because they sent a statement of fact that was explicitly manufactured, multi-paged, very many paragraphs, that said, New Horizons, you franchisor, you are the one that caused all this. You're responsible. And the AUSA sent that to our general counsel in December of 2019. What relief did they demand? Well, I guess I would say what relief does a baby demand when the baby hasn't been fed for two hours and the baby's crying? The parents don't hear the words, give me a banana, give me a bottle, give me food, but the parents know exactly what's being asked for, right? You don't have to say the words. So they clearly had their handout saying it's your fault, pay up. They didn't put a specific dollar amount on it at that point, but a demand does not have to be a specific amount. I knew it was coming at that point. Well, it came. I understand. It didn't get quantified. But the contract seems to say you've got to wait until it comes. I mean, right or wrong. Right, but the only question is did it come? And, again, a baby crying is saying I want food. We don't buy that argument. There certainly was a written demand on September of what, 2000? 2020. When the government did their dog and pony show. There's an approximately $400,000 or so swing, I think, if the claim shifts to later in time. Well, it's a big deal because that's what gets you above a million dollars, right? Well, we don't need to be above a million dollars because that government funding exclusion does not apply. I understand. Yeah, but it would make a difference if the government funding exclusion did apply, but certainly it does not. I think it's been interesting. We've taken you over. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Michael Hartley on behalf of National Union. If the Court doesn't mind, I think I'd like to explain the basics here a little bit in terms of the retention and how the policy works so that there's no confusion. So the way the policy works is that there has to be a claim, and that is part of the insuring agreement, part of the contract that says you have to take. There's not a dispute over whether there's a claim, right? No, but there's both a timing component to it and a retention component to it. So once you get to there being a claim, the policy has a base retention of $500,000. No matter what, pick whatever claim you want, whatever type, it's got a $500,000. Even if we were to say, hey, this doesn't fall within the exclusion, it doesn't fall within the $1 million, it still falls within a $500,000. That doesn't affect things here today per se, but just so the Court understands, right? So the plaintiff has to show there is a claim and when was it. Then a retention applies. And then if you don't even get to government funding, then you have the other two exclusions that counsel raised briefly and we addressed in our appellate's brief. This is the professional services? Yeah, and the wrong flag. But if you have a government funding claim, then you have, instead of a $500,000 retention, you have a $1 million retention. And what that applies to here is defense costs. And so when we're talking about parsing, what does the presentation demand, what was the amount that the insured received versus the additional damages or additional amounts that the government may have been seeking? For defense cost purposes, that's irrelevant. Because what you've got under the endorsement itself is it defines or it says loss does not include the return of funds, et cetera, et cetera, right? But then it has, it separately says, and this is the crux of the whole case in terms of defense cost coverage, because that's the only thing at issue here, defense cost coverage. There's no settlement. Well, I don't want to jump ahead, but the question that's lingering in my mind, and maybe this is what you're going to answer, is if it's only triggered by, you know, if 99% of the claim is not for a return of government funds, are you arguing it doesn't matter because you still had to expend the same amount of defense costs, whether it was 1% or 100%? It's even more expressed than that, and I can direct you to exactly the language and the policy. So what the government endorsement says is so if a, effectively what counsel is saying is that if it's not a government, if that part of the claim might trigger a $500,000 retention, part of the claim might trigger a $1 million retention, right? Because there's going to be a retention no matter what. What do you do in that circumstance? And what the government funding endorsement says is that in the event a claim triggers more than one retention amount under the policy, so even assuming that this applies, only the highest such amount will apply. Which amount shall apply to all laws for the claim? Got it. So the policy itself resolves this. We win even if it's 1%. It doesn't matter. I mean, we're saying it's not. 1%. Yeah, it's way more than 1%. But what we're saying is that the policy resolves this. So if there is a piece of it that is government funding, the analysis should end there. And the importance of the claim, obviously, is exactly what Your Honor said. It's a calculation of the numbers, right? So there's different pieces to that. And the way we present it to the court is the claim started with the presentation. The amount of defense costs that were incurred after the presentation was about $940,000. That is less than the government funding endorsement, so we're done. And even if we're not done with that, District Court, we have two other exclusions that would separately preclude coverage. The District Court decided that you're right, the complaints, I mean, the claim began with the presentation itself, because the policy itself says it doesn't cover investigations. It requires a claim. It started with the claim itself. So let's just, I mean, I think you're right about that. But the December, there is something to this December. It was a written, at least it was a written communication. I guess the only way they can win is they have to say, well, it wasn't an explicit demand, it was an implicit demand. And what the policy requires is a written demand. And what they're really getting down to, I think, is what an insurance subjective understanding was. Because there was no demand for relief of any kind in either the CID, in the email that the government sent, in the settlement agreement with the other franchise, or in the conversation that they had with a third party. None of those were demands by the government saying, we want relief from you, NHWH. So what was the purpose behind the AUSA sending the email to your general counsel? Or your insurance general counsel? They're in the middle of an investigation, right? And they are investigating allegations that were being made. Against the franchisees. Well, they were investigating, the CID itself said they were investigating allegations that NWHW potentially had violated the False Claims Act. Well, there's a distinction between a prosecutor issuing a subject or a target letter to a subject or target of an ongoing investigation. That didn't happen here. So the closest thing we've got is this email. Was he just trying to put the general counsel on notice that they'd entered into a settlement agreement with the franchisees? To be honest, I think it's more than that. I mean, I think what you've got is a substantial CID that's being submitted to NWHW. It's asking for a lot of documents. There are back and forths about the scope of those documents. And why are you getting them? And they are presenting now an email with a settlement agreement. And within the settlement agreement, it says all of the things that the franchise did, but also says the franchise in the settlement agreement is saying, well, NWHW told us to do some of this stuff. And so, to me at least, receiving that, you would be saying the government is investigating this. This is why it's asking for these documents from us, and so we will provide them to you. But it doesn't have to be a – there is no – Had NWHW itself received a civil investigative demand previous to that email? Yes. So the sequence of the events was there was a civil investigative demand that was served on NWHW before our policy period even started. So it was producing documents and presumably cooperating to some extent.  And running up legal fees in the process of responding to the CID. Exactly. So the CID comes out in – I'm not going to get the date exactly right, but a few weeks before our policy started, which was I think in early October. And then the emails come out in December where the government is explaining. They're in the process of producing documents. Your position is it's not until September of 2020 that an actual claim is made when the government does its PowerPoint presentation and actually demands money from your insurer. A written demand for monetary relief. That's correct. And the policy, to be clear too, the policy doesn't provide coverage for demands for non-monetary relief. There is an exclusion there. So the only issue really is whether those emails and other communications would somehow collectively morph this into a written demand for monetary relief. And under the standards at least that we have in California, it doesn't. So let me just ask you. So he made a big argument that this wasn't a demand for money received, right? Because he wants to get out – he wants – doesn't want the exclusion to apply at all. And I gather that would also mean that the extra $500,000 retention wouldn't apply. But from his perspective. Oh, you mean it would be a $500,000 instead of a million? Yeah, it would just be the $500,000. So why – what's your argument in response to his? That that's not what the policy says. The policy – Well, it says, Law shall not include the return of funds which were received from any federal, state, or local agency. And he says, we didn't receive any. We didn't. No, I understand that. The facts are different. So why is that wrong? I mean, is he right? Because the policy itself doesn't require that the funds be received by the insured. It doesn't have – it just says it has to be received from the federal government, not by this particular insured. And so what that addresses and encompasses situations – even if you assume they didn't get a dime of the money on a pass-through basis, that allows for claims exactly like this to fall within this endorsement. Because you were talking about money that was received by their franchisees at their inducement. And that money that they received is going to have to be returned to the government. And in this case, it will be returned by NWHW because that is money they received from the government. So the language itself doesn't include that. And we've cited – there are several cases, both in California and elsewhere, in similar circumstances where courts do not read into policy language, language like that, limiting language like that, that's missing. So he says really what the government was asking for was damages. There might have been some. I mean, we're not responsible. I mean, you know, the government could be asking for the moon, but so what? It's not really – it's not the amount that they're asking for per se, and it's not whether they label it as damages or they label it as something else. It's whether what they're asking for is the return of monies that they paid. And here the presentation was asking for that under three different theories. In writing, it was asking for it under the False Claims Act. And in the presentation itself, it described the measure of damages as the amount of money the government paid and the amount of money that was received by NWHW's franchisees. That's number one. Second one was a common law theory of unjust enrichment, return of monies paid by the government. And the third was, promised by mistake, same theory. So no matter what, they are asking for return of the monies that were paid. And in California, we've cited some of the cases, but the courts are – the state courts are pretty clear that how somebody characterizes or labels a damage or an amount doesn't matter. It's what the effect of it is. And so if the government is saying, you have defrauded me into paying you $1,000 because you've submitted a false claim and I want the money back, whether they couch that as a damage or they couch that as something else, they're still asking for the money back. So I hadn't picked up on that until you said it, and I went back and read it. It does say return of funds. I'd always assumed that – and his argument seemed to be premised on it had to be a return of funds that were paid to the insurer. That's not true. In a weird way, though, it doesn't matter because your argument would be the same. Even if 1% of this were a return of funds and 99% were somehow damages, you'd go to the, hey, this is commingled exclusions. $1 million exclusion applies. And the policy language that says if there's – yeah. No, that's right. And they're putting aside the fact that they – the government was – But your point is it's not just 1% that's really covered. It might be 1% that they received that they have to pay back, but you'd say the whole $70 million that were paid to the VA, that the government paid to a third party, that's still asking for that money to be paid back. No, that's exactly right. And the government wasn't shy about saying the amount that they actually received. I mean the presentation itself was calculating it out to the – I can't remember. Although, I mean, isn't there an argument that that – now that I've already said this doesn't matter, now I'm intrigued by it. But the return of funds, that – yeah, it is a return of funds. It's just not a – your point is it doesn't matter the source where the funds come from. Yes. Okay. Or what you call it. Exactly. Or what you call it. I don't have anything else. I appreciate very much the court's time. I think so. Yeah. Thank you. Go ahead. We'll give you two minutes for rebuttal. May it please the Court. It does 100% matter what you call it because it's what the insurance carrier called it in their policy. The whole analysis of an insurance policy boils down to what does the policy say. And you heard argument that, well, you can't read into this extra language. That's true. You also can't read into it different language that appears there. Your problem seems to be the commingling provision. What's your response to that? Two responses to that. First of all, they did not raise that in their papers. But second of all, that would – you're basically now compartmentalizing monies. You're saying, okay, as to this 1% – and I'm going to tell you in a minute that it is no 1% – but as to this 1%, if it does exist, if this 1% triggers two different retention amounts, then okay. The higher one applies. But the other 99% doesn't trigger the higher retention amount ever.  There's no return of funds. It can't be a return of funds. If one person has the money and I'm coming to you for it, you're not returning the funds. You're paying damages because of me defraudulently having given you some money. But you've acknowledged that there's some amount of return of funds. I do not. And let me tell you why. Oh. That would be a matter of proof that has not been done in this summary judgment proceeding. The proof would have to be – so remember, what happens is when you're a franchisee, you pay to the franchisor, New Horizons, one of two amounts each month. You pay a minimum franchise fee. And that's what you – and the record's clear that that's normally what's paid. Or if you have enough revenues to where a 6% of your revenues would exceed that minimum franchise fee, then you pay 6%. So what do they need for proof to establish that there's even one penny that might have indirectly flowed through to New Horizons? They need to show a month where the government paid a franchisee, that franchisee exceeded its minimum amount, and dollars from that flowed through to New Horizons. There is no record.  Weren't there cross motions for summary judgment? There were, Your Honor. So doesn't that mean there were no contested issues of material fact? No, there were contested issues as to both motions. But there was no – what I'm saying is there was never evidence submitted in the record showing that even $1 ever flowed through a franchisee to New Horizons, the franchisor. But most importantly, there was never a demand from the government. The $500 million that the government presented as damages to New Horizons, all they said was we think maybe $13 million of it hit your coffers, and they were wrong about that. But they said maybe it did. But that was – demanding a $500 million figure is not a return of the $13 million that we received. Okay. There's no return of funds. Thank you very much. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted, and that concludes our arguments for today. Thank you, Your Honor. All rise. Thank you, sir. This court for this session stands adjourned.
judges: PAEZ, TALLMAN, NELSON